IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

EUGENE S. HALL,

          Plaintiff,

v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

          Defendant.

Civil No. 6:14-cv-01410-PK

FINDINGS AND
RECOMMENDATION

PAPAK, Magistrate Judge:

Plaintiff Eugene S. Hall filed this action September 2, 2014, seeking judicial review of the Commissioner of Social Security's final decision denying his application for Disability Insurance benefits under Title II of the Social Security Act. This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3).

Page 1 - FINDINGS AND RECOMMENDATION

Hall argues that by erroneously rejecting medical evidence and erroneously rejecting his testimony regarding the extent of his impairments, the Commissioner failed properly to assess his residual functional capacity after completing step three of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits, and for that reason erred by finding Hall capable of performing past relevant work as a casework supervisor, counselor, and group work program aide at step four of the process.

I have considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's decision should be reversed and remanded for the calculation and payment of benefits.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 404.1520(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled.

Page 2 - FINDINGS AND RECOMMENDATION

*See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).  Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(c).  The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); *see also Bowen*, 482 U.S. at 141.  If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).  Nevertheless, it is well established that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), *citing Bowen*, 482 U.S. at 153-154.  "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work." *Id.*, *quoting* S.S.R. 85-28, 1985 SSR LEXIS 19 (1985).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).  If the claimant's impairments are equivalent to one of the impairments enumerated

in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, between the third and the fourth steps the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related physical and/or mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 404.1545(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof shifts, for the first time, to the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether a person with those characteristics and RFC could perform any jobs that exist in significant numbers in the national

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5 (July 2, 1996).

economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g),

404.1560(c), 404.1566. If the Commissioner meets her burden to demonstrate the existence in

significant numbers in the national economy of jobs capable of being performed by a person with

the RFC assessed by the ALJ between the third and fourth steps of the five-step process, the

claimant is found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§

404.1520(a)(4)(v), 404,1520(g), 404.1560(c), 404.1566. A claimant will be found entitled to

benefits if the Commissioner fails to meet that burden at the fifth step. *See Bowen*, 482 U.S. at

142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to

support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing

Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion." *Id.*, *quoting Reddick v.

Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id.*, *citing Robbins*, 466 F.3d at 882; *see also Edlund v. Massanari*, 253

F.3d 1152, 1156 (9th Cir. 2001). Moreover, the court may not rely upon its own independent

findings of fact in determining whether the ALJ's findings are supported by substantial evidence

of record. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003), *citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## SUMMARY OF ADMINISTRATIVE RECORD[2]

Hall was 53 years old on his alleged onset date of June 30, 2009. Tr. 150.[3] He completed a master's degree in counseling. Tr. 37. According to the evidence of record, prior to his claimed disability onset date Hall had substantial gainful activity as a probation unit supervisor for the Douglas County Juvenile Department. Tr. 36.

### I. The Medical Record

### A. Pre Onset Date of Disability

On October 2, 2002, Hall began treatment with Victor Richenstein, M.D., a psychiatrist. Tr. 386. Hall reported a work place altercation with three female co-workers. He had worked for Douglas County for 20 years, he felt his boss was looking for a reason to terminate him, and he felt betrayed. Hall had trouble sleeping, no appetite, weight loss, and was sad, tearful, anxious and irritable. *Id.* Hall had low energy, low motivation, and problems with concentration, memory and decision making. He had suicidal ideation.

---

[2] The following recitation constitutes a summary of the evidence contained within the Administrative Record, and does not reflect any independent finding of fact by the court.

[3] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 8.

Hall reported symptoms of anxiety, with a tightening sensation in his chest, and mild paranoia. His primary care physician had prescribed Paxil two weeks earlier. He was on the second week of a three week leave. Dr. Richenstein diagnosed major depression, moderate, rule out recurrent, and noted Hall was "currently 60-65% functioning." Tr. 387. Dr. Richenstein prescribed Ambien and provided a letter of continuing disability for three additional weeks, noting "I do not feel that he is capable of handling work at this time because of active symptoms of depression." *Id.*

Hall saw Dr. Richenstein nearly every month from October 2002 through September 2013. In June 2003 Dr. Richenstein noted increased depression, nightmares, and anger, and increased the Paxil. Tr. 372. In July 2003, Hall reported ongoing work place stressors, and Dr. Richenstein prescribed Xanax. Tr. 371. Hall was suspended from his job, and had "mild paranoid feelings," and "mild symptoms of depression with facial flattening...." Tr. 369. Hall originally asserted that August 20, 2003 was the onset date of his disability. On August 23, 2003, Dr. Richenstein recorded that Hall had been terminated from his job, and was tearful. Tr. 368. Dr. Richenstein noted that "[I]n general he is struggling with grief and loss," with intrusive nightmares of two security guards who had assaulted him in corrections. Tr. 323. Hall's wife reported these nightmares occurred about twice a month. Hall's affect was flat, depressed, and tired. *Id.* In October and November 2003, Dr. Richenstein recorded increased depression, grief, and physical and emotional fatigue. Tr. 397-98.

On January 29, 2004, Hall reported depression, anxiety, anger, and nightmares. Tr. 396. By March 2004, Hall's depression was a little better on increased Lexapro, but he was angry. Tr. 394. In May and June 2004, Richenstein recorded Hall was not stable, had increasing

Page 7 - FINDINGS AND RECOMMENDATION

depression, and was frustrated. Dr. Richenstein increased Hall's Lexapro. Tr. 392. Hall was

volunteering part time at a local school. In July 2004 Hall reported increasing anxiety, intrusive

trauma-related nightmares, but was considering going to school to get his master's degree. Tr.

391- 93. He was taking Lexapro, Wellbutrin, and Benadryl. In August 2004, Hall had good and

bad days as he anticipated a mediation over his termination. Tr. 390. The following month, Hall

reported the mediation had failed and there would be a trial. Tr. 389. Hall had started a part-

time job in a craft and hobby store. Through November, December 2004, and January 2005, Hall

reported increasing anxiety, flashbacks of traumatic events, shame, guilt, and anger. Tr. 388-90.

In February 2005, Hall reported increased depression. Tr. 407. Dr. Richenstein

suggested increasing Wellbutrin or Lexapro, but Hall did not want to take more medication. *Id.*

In March Hall was "somewhat better" after increasing his Wellbutrin. Tr. 406. Dr. Richenstein

noted the litigation process "in itself induces triggered anxiety." *Id.* In April, Hall reported

increased depression and he had cut his dose of Wellbutrin in half. Tr. 405. Hall had decided to

pursue an MSW degree online, and was advised to increase his Wellbutrin. In June, Hall

reported he was volunteering part-time in a group home. Tr. 404. By September Hall reported

increased depression and Xanax was prescribed. Tr. 402. In October 2005, Hall had increased

depression with the postponement of his trial date, he was challenged by his on-line course work,

and was considering a part-time waiter job. Tr. 401. Through November and December, Hall

had increased anger, anxiety, and frustration. Tr. 400, 366.

In February 2006, Hall lost his trial and he was angry, with problems focusing on his

schoolwork. Tr. 365. In March, Hall reported increased depression and difficulties with

concentration, low energy, and passive suicidal ideation. Tr. 364. Dr. Richenstein increased the

Page 8 - FINDINGS AND RECOMMENDATION

Wellbutrin. *Id.* In May, Hall reported the County was seeking $250,000 from him for legal fees and he was filing for bankruptcy. Tr. 363. By June 2006, Hall had a $217,000 judgment against him, he could not concentrate or do school work. Tr. 362. He was irritated with rapid digestion and nightmares. *Id.* By September, Hall was behind in his school work due to difficulty focusing, and the following month Dr. Richenstein noted Hall might need a note from the doctor regarding the incomplete work. Tr. 359-60. Dr. Richenstein also noted "will help [with] disability papers." Tr. 359.

Dr. Richenstein saw Hall in October and November 2006, and in January, March, April and May of 2007. In June 2007, Dr. Richenstein noted Hall had finished his masters degree and was "doing well." Tr. 353. In October, Hall was attempting to start a private counseling business with the hope of acquiring two or three cases by the end of December. Tr. 351. His Lexapro was increased. In December, Hall reported increased depression and anxiety, was unable to sleep, had racing thoughts, and "went blank" went confronted by a former co-worker. Tr. 350.

In February 2008, Hall was "struggling with depression," with no energy. Tr. 348. In May, Hall continued to report depression and anxiety, and Dr. Richenstein prescribed Abilify. Tr. 345. Hall volunteered at a homeless youth shelter ten hours a week in July, and stopped the Abilify because it made him feel "dopey." Tr. 344. Hall saw Dr. Richenstein in September and reported being angry. Tr. 343. By October, Hall was volunteering 15 hours a week in the homeless youth shelter, had continued depression and fatigue, and exhibited pressured speech. Tr. 342. His Lexapro was increased. In November 2008, Dr. Richenstein described Hall as stable, but in January his depression had increased, with fatigue and the inability to focus, and

PTSD triggers. Tr. 340-41. His medication made Hall feel "dopey," and Dr. Richenstein suggested Hall pursue therapy more frequently than monthly and consider a provider closer to his home. In February 2009, Dr. Richenstein increased Hall's Lamictol. Tr. 339.

A March 20, 2009, MRI revealed multilevel degenerative disc disease, severe at C5-6 and C6-7 with central canal narrowed to less than eight millimeters. Tr. 469. On March 20, Catherine Gallo, M.D., diagnosed bilateral moderately severe foraminal stenosis, with disc collapse and spondylosis at C5-6 and C6-7, and a limited range of motion. Tr. 236. On March 31, Hall had an anterior cervical discectomy at C4-5 with decompression and fusion. Tr. 241-43.

In June 2009, Dr. Richenstein noted Hall had continued right arm weakness and described him as stable. Tr. 337. Hall amended his onset date of disability to June 30, 2009.

## B. Post Onset Date of Disability

In August 2009, Dr. Richenstein reported Hall was seeing one client, and the County had blocked his access to the Juvenile Detention Center because of the pending lawsuit. Tr. 336. Hall had a mixed affect, he was frustrated and emotional. *Id.* In October, Hall reported increased anger and his Xanax was increased.        Tr. 335. By November, Hall was "very distressed," with PTSD triggers from past trauma. Tr. 334. Hall was taking Lexapro, Wellbutron, Xanax, and Lamacitol. *Id.*

Dr. Richenstein noted, in January 2010, that Hall's mood issues persisted, but he had returned to volunteer at the teen homelsess center Tr. 333. He prescribed Deplin. *Id.* Hall was described as more stable in February, but more stressed in March. Tr. 331-32. In June, Hall was fatigued, with nightmares and PTSD triggers. Tr. 330. He was angry, his trial had been postponed, and he had to refinance his home. *Id.* He was prescribed Clonidine. He did not

Page 10 - FINDINGS AND RECOMMENDATION

agree with the style of group sessions at the homeless center and would not participate. He became negative, irritable and could not return to the building. Tr. 329. His last day was June 30. *Id.*

In July 2010, Hall said he was "worse [than] I've been in a long time," and Dr. Richenstein noted increased depression. Tr. 329. The next month Hall's depression had increased, and Dr. Richenstein increased his Wellbutrin and Clonodine. Tr. 328. Between September and December 2010 Hall reported increasing depression, hopelessness, anxiety, exhaustion, anger, pressured speech, and PTSD symptoms. Tr. 324-27. December 31, 2010 is Hall's last insured date for disability benefits.

In January 2011, Hall reported increased depression following an unsuccessful job interview. Tr. 321. In March, Dr. Richenstein diagnosed major depression and anxiety, and noted Hall might need to file bankruptcy. Tr. 320. Hall was taking Lexopro, Lamictol, Deplin, Wellbutrin, Xanax, and Clonopin. *Id.* His depression increased in April. Tr. 319. In May, Hall reported increased anxiety, he wasn't sleeping, and increased PTSD symptoms. Tr. 318. His Clonopin was increased. *Id.* By June, Hall's nightmares and anxiety had increased, and his Lamictal was increased. Tr. 317. In August 2011, Hall reported feeling suicidal, and his Xanax was increased. Tr. 315. He started volunteering part-time at legal aid. In October, Dr. Richenstein wrote that it was "unclear [whether Hall] benefits from current med[ication]s." Tr. 314. In December, Hall had "some improvement" with Viibryd, with increased anxiety and pressured speech. Tr. 312-13.

In January, February, and April 2012, Hall reported increased anxiety and PTSD symptoms, lack of sleep, fear of being assaulted, an inability to focus or take notes, and an

Page 11 - FINDINGS AND RECOMMENDATION

inability to meet deadlines or complete paperwork. Tr. 309-11. Dr. Richenstein described him

as agitated, angry, and defensive. Tr. 309. Hall filed the application at issue here on April 8,

2012, alleging disability due to "PTSD, clinical depression, neck and back injury." Tr. 178.

In May 2012, Hall reported memory lapses and periods of being unaware of his

surroundings. Tr. 308. He had increased anxiety symptoms, including fatigue and

hypervigilence. *Id.* On July 25, 2012, Dr. Richenstein noted a relapse of PTSD symptoms. Tr.

307. Hall was doing volunteer counseling and was able to talk to his clients but "cannot do the

other professional piece." *Id.*

On July 2, 2012, Mary Ann Iyer, M.D., reviewed Hall's medical records and found him

not disabled. Tr. 60-66. Dr. Iyer noted "[claimant] noted he has been seen and dx per Dr. Victor

Richenstein 3/12 with PTSD/clinical depression and anxiety, currently in therapy. This

m[edical] e[vidence] [of] r[ecord] not requested outside of timeframe under adjudication." Tr.

64.

On July 27, 2012, Dr. Richenstein wrote a letter to the Oregon Disability Determination

Services in which he noted Hall had ten years "with recurrent and persistent symptoms of

depressed mood and Posttraumatic Stress Disorder." Tr. 305. Dr. Richenstein reported Hall had

attempted to work at various positions, but was unable to sustain work "because of

overwhelming posttraumatic stress symptomatology. His symptoms include-anxiety,

hyperarousal, triggered frightened responses, paranoia, emotional numbing, nightmares,

depression and suicidality." *Id.* Dr. Richenstein stated Hall's condition was persistent and

progressive despite medication, psychotherapy and behavioral interventions, and it was chronic

with a poor prognosis. Tr. 306. Dr. Richenstein stated he "consider[s] Mr. Hall fully disabled

from work," and Hall would be unable to be employed in the next twelve months. *Id.*

Hall continued to see Dr. Richenstein monthly through September 2013. Tr. 419-31.  On

October 10, 2013, Dr. Richenstein completed a form prepared by counsel in which he reiterated

his diagnoses and symptoms, and concluded that Hall would be unable to sustain even a low

stress job, that Hall's ability to be flexible and adapt had declined, and that he had been unable to

sustain a part-time volunteer position because of triggered anxiety reactions. Tr. 490-92. Dr.

Richenstein checked boxes indicating Hall was markedly limited in the ability to perform

activities within a schedule, maintain regular attendance and be punctual within customary

tolerances; in the ability to work in coordination with or proximity to others without being

distracted by them; in the ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods; in the ability to interact appropriately with

the general public; in the ability to accept instructions and to respond appropriately to criticism

from supervisors; and in the ability to get along with co-workers or peers without distracting

them or exhibiting behavioral extremes.  Tr. 493-94. Dr. Richenstein found Hall was

moderately limited in the ability to understand and remember detailed instructions; in the ability

to carry out detailed instructions; in the ability to maintain concentration and attention for

extended periods; in the ability to sustain an ordinary routine without special supervision, in the

ability to make simple work-related decisions; in the ability to respond appropriately to changes

in the work setting; and in the ability to travel in unfamiliar places or to use public transportation.

Tr. 493-95.

Page 13 - FINDINGS AND RECOMMENDATION

Neal E. Berner, M.D., reviewed Hall's record on reconsideration and found, on

November 30, 2012, Hall not disabled. Tr. 69-77. Dr. Berner reviewed Dr. Richenstein's

records from June and December 2007, May and November 2008, March, June and November

2009, and December 2010. Tr. 72-73. Dr. Berner stated there was "insufficient evidence [of

disability] prior to D[ate] L[ast] I[nsured]. *Id.*

## B. The Hearing Testimony

On November 20, 2013, a hearing was conducted before an ALJ in connection with Hall's

application. Tr. 32-59. Hall, his counsel, his wife Tonya Hall, and a vocational expert were

present. Tr. 32

Hall testified that in 2003 he was the probation unit supervisor with Douglas County

Juvenile Department. Tr. 36. He was assaulted by a coworker over a five year period, and the

director of the department did nothing about it. Hall reported the assaults to the human resources

department, and was ultimately fired. Tr. 37. He brought a civil suit against the department,

which was resolved by the time of the hearing.

Hall finished his master's degree in counseling and started his own business evaluating

youth offenders on behalf of defense attorneys. *Id.* The business ended after about a year, in

2008, because the County Commissioners refused Hall access to the detention center and he was

not able to see his clients. Tr. 38.

Hall worked as a Youth Conservation Corps supervisor and with homeless youth at a

drop-in center. The positions ended when state funding was exhausted. Tr. 39. He worked

about 20 hours a week at the center and about 10 hours a month at the Corps. Tr. 49. Hall

volunteered as a therapist for Roseburg Legal Aid for about 18 months, until a year before the

Page 14 - FINDINGS AND RECOMMENDATION

hearing, but had to stop because the domestic violence situations triggered his anxiety symptoms of hypervigilance, inability to focus, nightmares, and inability to be around groups of people. Tr. 40. He worked about 20 hours a week. Tr. 49. He could not have worked more because the work was extremely intense and draining. *Id.* The symptoms began in 1995 and have worsened over time. Tr. 40.

Symptoms are triggered when Hall sees someone who reminds him of a former client, many of whom were violent with violent families. Tr. 41. Unexpected violence, like school shootings, are a trigger. Symptoms usually last about two weeks, during which he "can't function." *Id.* He sleeps, stays in his home, and avoids people. When volunteering at legal aid, he missed work as a result of his symptoms.

Hall was talking Lamectil, Wellbutrin, Vibred, Xanax, Deplin, and Clonodine, and had side effects of blurry vision, lethargy, and feeling over medicated. Tr. 42. If he forgets to take the Vibred he has gastrointestinal issues.

Hall stated he has herniated discs in his neck and nerve damage in his right shoulder. Tr. 43. He does not have full use of either shoulder and less than full strength in his arms. He can only raise his arms to a certain point, and cannot lift them over his head. *Id.* He has pain in his shoulders that wakes him at night. He has limited range of motion in his neck. Tr. 44.

Hall is not able to do housework or yard work. He forces himself to go to the store in order to feel like he is contributing. Tr. 45. For hobbies, he plays the guitar, flies radio-controlled airplanes, and builds model airplanes. When he has hypervigilance symptoms, he does not go to the radio control group or go out and fly. He has symptoms three or four times a month. Tr. 46. He is a member of a health club and does some weight lifting, aerobics, and

Page 15 - FINDINGS AND RECOMMENDATION

cross-training. He does not go to the gym when he has hypervigilance symptoms. The symptoms worsened in 2006 when a judgment for $250,000 was entered against him. Tr. 47. Hall went back to trial in 2011 and the judgment was increased to $300,000. He thought the County was going to take his home, and eventually the County vacated the judgment. Tr. 48.

Mrs. Hall testified that they had been married almost 21 years. Tr. 50. She works full-time, and sees her husband at breakfast, lunch, and in the evening. Mr. Hall does not prepare meals. They share household chores, though Mrs. Hall does "more throughout the week." Tr. 51. Mrs. Hall said her husband has hobbies, emails on the computer, and they work out about four nights a week.

Mrs. Hall said her husband has anxiety symptoms several times a week, and had been too anxious to go to the gym the evening before the hearing. Tr. 52. He is usually irritable, and has nightmares. She stated this had been a particularly bad year because of their legal and financial issues. *Id.* Prior to a year ago, his symptoms were similar, and he was irritable, depressed, with poor concentration, and he did not want to be around people several times a week. His symptoms increased due to violence and drug activity in their neighborhood. Tr. 53. The domestic violence and suicidal teenager Mr. Hall saw at Legal Aid caused his symptoms to increase. He was volunteering no more than five hours per week, and the position was very flexible. He made phone contact with clients from home sometimes. Mrs. Hall testified that the symptoms had been ongoing for the past twelve years, and were getting progressively worse. Tr. 54. She estimated the last three years had been particularly hard, because of the legal issues, violence in the neighborhood, and violence in the media. *Id.* . Mrs. Hall estimated her husband was unable to function outside of the home "a couple of days each week." *Id.*

Page 16 - FINDINGS AND RECOMMENDATION

The VE testified that an individual who would miss work, leave early, or be tardy up to two times per month due to mental health symptoms would be unable to sustain employment. Tr. 57. A hypothetical individual who was able to do complex tasks and instructions most of the time, but was limited one day a week to simple tasks and instructions due to mental health symptoms would be unable to return to Hall's past relevant work. Tr. 58.

## C. Lay Witness Testimony

On November 12, 2013, Harry J. Mullins, Ph.D., submitted a letter in support of Hall's disability claim. Tr. 235. Dr. Mullins wrote that he has been friends with Hall since 1986, and employed him as a youth counselor from 2008-2011, where "he did a great job." *Id.* Hall was terminated when the budget was cut.

Dr. Mullins stated that he noticed increasing personality changes in Hall, starting in 2008. Hall was irritable and obsessed with his legal issues. In 2011 Dr. Mullins suggested Hall seek help for what he believed to be chronic stress-induced depression.

On December 13, 2013, the ALJ issued a decision finding Plaintiff not disabled. Tr. 18-27. Hall requested review of the ALJ's decision, Tr. 12-14, and the Appeals Council denied his request on July 2, 2014. Tr. 1-4. In consequence, the ALJ's decision of December 13, 2013, became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found that Hall did not engage in substantial gainful activity at any time following his

amended claimed disability onset date of June 30, 2009. Tr. 15. The ALJ found Hall's date last insured was December 31, 2010. He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Hall's medical impairments of multilevel cervical degenerative disc disease status post anterior cervical disc fusion at C4-5 with iliac crest graft was "severe" for purposes of the Act. *Id.* The ALJ stated that Hall's medically determinable mental impairments of major depressive disorder, PTSD, and anxiety disorder, did not cause more than minimal limitation in his ability to perform basic mental work activities and were, therefore, non-severe. Because an impairment was deemed severe, the ALJ proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Hall's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 22. The ALJ therefore properly conducted an assessment of Hall's residual functional capacity. Specifically, the ALJ found Hall had the capacity to perform light work, except he could occasionally climb ladders, no frequent crawling, no frequent bilateral reaching in all directions, and must avoid vibrations and hazards. Tr. 22.

At the fourth step of the five-step process, the ALJ found that Hall had past relevant work as a casework supervisor, retail sales clerk, counselor, and group work program aide. Tr. 26. The ALJ relied on the testimony of a Vocational Expert (VE) that an individual with the RFC set out above could perform all of Hall's past relevant work. Tr. 27. On that basis, the ALJ concluded that Hall was not disabled as defined in the Act at any time between June 30, 2009, and December 31, 2010. *Id.*

**ANALYSIS**

Page 18 - FINDINGS AND RECOMMENDATION

Hall argues that the Administrative Law Judge improperly (1) failed to consider a post-hearing letter; (2) rejected the treating psychiatrist; (3) failed to credit Hall's own testimony regarding the severity of his symptoms ; (4) failed to credit the lay witness; (5) failed to find depression and PTSD "severe" at step two; and (6) found Hall capable of performing his past relevant work.

## I.  Post Hearing Evidence

Post-hearing, Hall submitted to the Appeals Council an additional letter from Dr. Richenstein dated May 15, 2014. This document is attached to Plaintiff's Amended Brief as Exhibit A. The Commissioner contends that this evidence should not be considered by this court.

Generally, the court considers post hearing evidence because it is part of the administrative record even if not part of the record before the ALJ. *Brewes v. Comm'r.,* 682 F.3d 1157, 1163 (9th Cir. 2012), citing *Lingenfelter v. Astrue,* 504 F.3d 1028, 1030 n.2 (9th Cir. 2007)(when Appeals Council considers new evidence in denying a claimant's request for review, the reviewing court considers both the ALJ's decision and the additional evidence submitted to the Council).

The Commissioner argues that, unlike in *Brewes,* the Appeals Council did not "consider" this evidence. The regulations provide "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." *Brewes,* 682 F.3d at 1162 n.3 (quoting 20 C.F.R.§ 404.970(b)(1)).

In denying Hall's Request for Review, the Appeals Council wrote:

Page 19 - FINDINGS AND RECOMMENDATION

> We also looked at the letter from Victor Richenstein, M.D., dated
> May 15, 2014. The Administrative Law Judge decided your case
> through December 31, 2010, the date you were last insured for
> disability benefits. This new information is about a later time.
> Therefore, it does not affect the decision about whether you were
> disabled at the time you were last insured for disability benefits.

Tr. 1.

The Appeals Council did not make the May 15, 2014, letter part of the administrative

record. The court may consider the physician's opinion to determine whether, in light of the

record as a whole, the ALJ's decision was supported by substantial evidence and free of legal

error. *Ramirez v. Shalala,* 8 F.3d 1449, 1451-54 (9th Cir. 1993); *Taylor v. Comm'r of Soc. Sec.,*

659 F.3d 1228, 1232 (9th Cir. 2011).  Moreover, contrary to the Appeals Council's assertion, the

letter specifically addresses Hall's mental health limitations prior to his date last insured.

Accordingly, the court should consider Dr. Richenstein's May 15, 2014 letter.

## II. The Medical Evidence

An ALJ may properly reject a treating physician's uncontradicted medical opinion only

for "clear and convincing reasons." *Lester v. Chater*, 81 F.3d 821, 830-831 (9th Cir. 1995).

When the treating physician's opinion has been contradicted, however, it may be rejected for

"specific and legitimate reasons that are supported by substantial evidence in the record."

*Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). This can be done

by setting out a detailed and thorough summary of the facts, providing an appropriate

interpretation thereof, and making findings. *See Megallanes v. Bowen*, 881 F.2d 747, 751 (9th

Cir. 1989).

As set out above, treating psychiatrist Dr. Richenstein wrote in October 2013 that Hall had been unable to sustain even a low stress job for the past 11 years. Tr. 492. Dr. Richenstein assessed multiple marked limitations and stated they existed since October 2002. Tr. 493-95.

The ALJ gave Dr. Richenstein's opinion no weight, stating it was "not supported by his own medical chart records, the claimant's testimony, Mrs. Hall's testimony, and the full record generally." Tr. 26.

## A. Physician Opinion of Disability

The ALJ gave no weight to Dr. Richenstein's opinion that Hall was "fully disabled from work," because the issue of disability is reserved to the Commissioner and outside of his area of expertise. Tr. 26. However, a physician's assessment regarding the ability to sustain employment, based on objective medical evidence, must be considered by the ALJ. *Hill v. Astrue,* 698 F.3d 1153, 1160 (9th Cir. 2012). The fact that the ultimate issue of disability is reserved to the Commissioner is an accurate statement of the law, but it is not a clear and convincing reason to reject a treating physician's opinion.

## B. The Physician Opinion is Consistent with the Medical Records

Dr. Richenstein opined in October 2002 that Hall was unable to sustain employment due to mental health issues and symptoms of depression. Tr. 387. As set out above, Dr. Richenstein continued to record increasing depression, with physical and emotional fatigue, through 2003. Tr. 372, 371, 369, 368, 323, 397-98.

Throughout 2004, Dr. Richenstein noted instability, increased depression, increased anxiety and anger, with nightmares and increased medications. Tr. 396, 394, 392, 391-93, 390, 389, 388-90. This pattern of waxing and waning, but generally increasing depression, anxiety,

Page 21 - FINDINGS AND RECOMMENDATION

and PTSD symptoms continued through June 30, 2009, Hall's date last insured. Dr. Richenstein repeatedly increased medication doses and added new medications. Tr. 392, 407, 404, 402, 364, 351, 345, 342, 339.

On this record, the treating physician's opinion that Hall is unable to sustain employment due to multiple mental health issues is supported by the medical record.

**C. The Physician Opinion is Consistent with Hall's Activities**

The ALJ noted Dr. Richenstein's opinion that Hall had moderate to marked limitations in his ability to maintain a schedule, be punctual, or travel to and in unfamiliar places. Tr. 26, 493, 495. The ALJ said this contrasted with Hall's ability to travel 120 miles monthly to meet Dr. Richenstein. Tr. 26. However, the ability to maintain a once a month appointment is not necessarily inconsistent with significant limitations in the ability to maintain a schedule or be punctual. Hall made the trip for years, and the travel was not in unfamiliar places. This is not a clear or convincing reason to discredit the treating physician.

The ALJ noted that Dr. Richenstein opined that Hall was unable to maintain employment due to his mental health issues, but worked as a youth outreach counselor from 2008-2011, when the job ended due to budget constraints. Tr. 26, 235. Hall started working at the Phoenix School two hours a day, in July 2008. Tr. 344. In January 2009, Hall told his doctor he was not going to renew his contract for the counselor job as he did not get along with the supervisor. Tr. 340. He had increased depression and could not focus. *Id.* Dr. Richenstein recorded in January and March 2010, that Hall was working 30 hours a week. Tr. 331, 333. Hall reported in February 2010 that his supervisor was humiliating him and contradictory. Tr. 332. By June, Hall continued to complain of his supervisor, that the clients were not getting appropriate treatment,

Page 22 - FINDINGS AND RECOMMENDATION

and Hall would not participate in group sessions. Tr. 330. Hall testified that he worked 20 hours a week at the Phoenix School and 10 hours a week as a Youth Conservation Corp supervisor. Tr. 49. Hall worked at the Phoenix School between June 2008 and July 2009, and again from February 2010 to June 2010. Tr. 202.

Although Hall was able to work several months longer than Dr. Richenstein's assertion of three months, the treatment records indicate Hall had significant emotional difficulties with the work, and was unable to sustain the employment. The treating psychiatrist was not precisely correct as to the length of time Hall was able to sustain employment, but he is correct that Hall had been unable to sustain work for long. In addition, the ALJ specifically found that Hall has not engaged in substantial gainful activity since his alleged onset date through his date last insured. Tr. 20.

**D. The Physician's Opinion is Consistent with Hall's Testimony**

Hall testified that he was unable to continue his volunteer counseling work because exposure to domestic violence situations triggered his anxiety symptoms of hypervigilence, inability to focus, nightmares, and inability to be around groups of people. Tr. 40. He could not have worked more because the work was intense and draining. Tr. 49. Hall offered no testimony inconsistent with Dr. Richenstein's opinion regarding his mental health limitations.

**E. The Physician's Opinion is Consistent with Mrs. Hall's Testimony**

Mrs. Hall testified that her husband has anxiety symptoms several times a week, is irritable, and has nightmares. Tr. 52. She said he was depressed, with poor concentration, and was unable to function outside of his home "a couple of days each week." Tr. 54. Mrs. Hall's testimony is consistent with Dr. Richenstein's opinion regarding Hall's mental health limitations.

**F. The Physician Opinion is Uncontradicted**

There is no evidence in the medical record that contradicts Dr. Richenstein's opinion.

The ALJ failed to identify clear and convincing, or specific and legitimate, reasons to reject the uncontradicted opinion of the treating physician. This court should find the ALJ erred in rejecting Dr. Richenstein's opinion and the ALJ's decision is not supported by substantial evidence.

**III. Credibility**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir 1995). However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir 1998). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.* The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Reddick,* 157 F.3d at 724. *See also Holohan v. Massinari,* 246 F.3d 1195, 1208 (9th Cir 2001). General findings (e.g., "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick* at 722. *See also Holohan,* 246 F.3d at 1208. The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the

Page 24 - FINDINGS AND RECOMMENDATION

claimant's testimony regarding the severity of her symptoms." [Footnote omitted.] *Smolen v.*

*Chater,* 80 F.3d 1273, 1281 (9th Cir 1996).

> Under the *Cotton* test, a claimant who alleges disability based on subjective
> symptoms "must produce objective medical evidence of an underlying
> impairment which could reasonably be expected to produce the pain or other
> symptoms alleged...." *Bunnell,* 947 F.2d at 344 (quoting 42 U.S.C. § 423
> (d)(5)(A) (1988)); *Cotton,* 799 F.2d at 1407-08. The *Cotton* test imposes
> only two requirements on the claimant: (l) she must produce objective
> medical evidence of an impairment or impairments; and (2) she must
> show that the impairment or combination of impairments *could*
> *reasonably be expected to* (not that it did in fact) produce some degree
> of symptom.

*Smolen,* 80 F.3d at 1282.

The ALJ found Plaintiff not fully credible as to the intensity, persistence, and limiting

effects of his symptoms to the extent they are inconsistent with the residual functional capacity

assessment. Tr. 24. The ALJ cited inconsistences in Hall's hearing testimony. Specifically, the

ALJ noted Hall testified that triggers cause him to isolate himself in his home without outside

contact, three or four times a month, with symptoms lasting a "couple weeks." Tr. 41.

Thereafter Hall clarified that his symptoms might last for a week or week and a half. Tr. 47. The

ALJ noted this would mean Hall would be unable to function outside of his home most of any

given month. Tr. 24. The ALJ properly noted such limitations were inconsistent with the lay

testimony that he worked out at the gym four days a week and the fact that he did some work.

Tr. 23.

The ALJ noted that Hall was able to maintain his probation officer supervisor role after

the 1995 assaults until 2002 even with triggers and mental symptoms related to the assault. Tr.

22-23. Plaintiff properly points out Hall was receiving feedback from co-workers that he was

Page 25 - FINDINGS AND RECOMMENDATION

abusive, hostile and intimidating. Tr. 386. In October 2002 Dr. Richenstein took him off work

for three weeks, noting Hall was angry, agitated, and anxious. Tr. 387.  In August 2003 Hall

was suspended pending an investigation. Tr. 369. A co-worker accused Hall of being

unprofessional. *Id.* That Hall was able to maintain employment for a period of time after the

assaults is not a clear or convincing reason to find him not credible.

The ALJ said that Hall was able to complete his master's degree, start a business

evaluating juvenile delinquents, and counsel teenagers despite side effects from several

medications. Tr. 23. Hall obtained his degree in an online program with some difficulty and

accommodations. Tr. 359-60, 362. His business evaluating juvenile offenders lasted ten months

during which he earned $8,000. Tr. 198. The counselor work was part-time, and Hall did not get

along with his supervisor, consistent with Dr. Richenstein's diagnoses and opinions. Tr. 343.

The ALJ's determination that Hall was not fully credible as to the extent of his pain and

limitations is not  supported by clear and convincing reasons and substantial evidence and should

not be affirmed.

## IV. Lay Testimony

The ALJ has a duty to consider lay witness testimony. 20 C.F.R. § 404.1513(d);

404.1545(a)(3); 416.945(a)(3); 416.913(d); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

Friends and family members in a position to observe the claimant's symptoms and daily activities

are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918-

19 (9th Cir. 1993). The ALJ may not reject such testimony without comment and must give

reasons germane to the witness for rejecting her testimony. *Nguyen v. Chater*, 100 F.3d 1462,

1467 (9th Cir. 1996).  However, inconsistency with the medical evidence may constitute a

germane reason. *Lewis*, 236 F.3d at 512. The ALJ may also reject lay testimony predicated upon

the testimony of a claimant properly found not credible. *Valentine v. Astrue*, 574 F.3d 685, 694

(9th Cir. 2009).

## A. Tonya Hall

The ALJ stated that the majority of Mrs. Hall's testimony related to her observations of

Hall after his date last insured of December 31, 2010. Tr. 24. However, Mrs. Hall clearly

testified that Hall was irritable and depressed, with difficulty concentrating and a tendency to

avoid people, for about twelve years. Tr. 52. That she also testified to her observations after the

date last insured is not a germane reason to reject her testimony relating to the period prior to his

date last insured.

## B. Harry Mullins, Ph.D.

Dr. Mullins wrote that he had known and worked with Hall since 1986. Tr. 235. He got

Hall involved as a volunteer at Phoenix School and in 2008 hired him as a youth outreach

counselor. Dr. Mullins wrote that he began noticing a change in Hall's personality in 2008 as he

was quick to lose his temper over trivial things. *Id.* Hall was obsessed with his legal issues and

his mood changed often as his case progressed. Dr. Mullins' impression was that Mr. Hall's

stress had resulted in stress-induced depression, and he urged Hall to seek treatment.

The ALJ stated that Dr. Mullins acknowledged that he did not have expertise in

addressing depression. Tr. 24. This is not a germane reason for rejecting Dr. Mullins's lay

observations.

The ALJ noted that Dr. Mullins reported Hall had been "great" at his counseling job. Tr. 21. However, Hall's hours were limited, he could not get along with his supervisor, he could not attend group sessions, and eventually he told Dr. Richenstein he could not re-enter the building.

## V. Step Two and Step Four

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert,* 482 US 137, 140-41 (1987). The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." According to the regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." 20 CFR § 404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 CFR § 404.1521(b).

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Yuckert,* 482 US at 153-54. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work." *See* SSR 85-28; *Yuckert v. Bowen,* 841 F2d 303, 306 (9th Cir 1988) (adopting SSR 85-28). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, and cannot be established on the basis of a claimant's symptoms alone. 20 CFR § 404.1508.

The evidence shows that Hall's symptoms from major depression and PTSD caused marked limitations in numerous areas of mental functioning. Tr. 306, 493-494. The ALJ erred by failing to include the limitations arising from Hall's mental impairments into the residual

functional capacity assessment at step four. Because the ALJ excluded major depression and PTSD from Hall's list of severe impairments, the RFC determination was not supported by substantial evidence.

## REMAND

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F.3d 172, 1178 (9th Cir. 2000), *cert. denied,* 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r,* 635 F.3d 1135, 1138-39 (9th Cir. 2011)(quoting *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004)). The court may not award benefits punitively, and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart,* 340 F.3d 871, 876 (citing *Bunnell v. Sullivan,* 947 F.2d 871(9th Cir.

2003)(en banc)).  The reviewing court should decline to credit testimony when "outstanding issues" remain.  *Luna v. Astrue,* 623 F.3d 1032, 1035 (9th Cir. 2010).

The ALJ's failure to credit the opinion of the treating physician is erroneous for the reasons set out above.  The Vocational Expert testified that, if Dr. Richenstein's opinion is credited, Hall would be unable to maintain employment.  Tr. 58.

Accordingly, this matter should be remanded for the immediate calculation and award of benefits.

## RECOMMENDATION

For the foregoing reasons, the Commissioner's decision should be reversed and this matter should be remanded for the calculation and payment of benefits.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no Objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If Objections are filed, a response to the objections is due fourteen (14) days after being served with a copy of the Objections, and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 29th day of September, 2015.

Honorable Paul Papak
United States Magistrate Judge

Page 30 - FINDINGS AND RECOMMENDATION